In re CAMBRIDGE CAPITAL,
LLC, Debtor.

Securities Investor Protection Corporation, as trustee for the liquidation of the business of Cambridge Capital, LLC, Plaintiff,

v.

Thomas Michael Rossi, Frances Thomas, LLC (d/b/a Cambridge Holding), Lisa Caponigro, Jerry Baim, Emil Buckner, Anmar Trading Co., Andrew Cohen, Martin Cohen, RKE LLC, Kenneth Etra, Richard Etra, Steven Etra, SRK LLC, Gary C. Granoff, Ezra Hamway, Richard Kandel, Kandel & Company Pension Plan (a/k/a Kandel & Son Profit Sharing), Michael Kempner, Steven Kobren, Joel Lamm, Steve Levy, Walter Lieb, Jay Viders, Warren Wagner and David Zhatt, Mountain Investment L.P., Robert Rossi, Louise C. Lavino and Chess Match, Inc., Defendants.

Bankruptcy No. 01–01057–ess.
Adversary No. 03–1031–ess.

United States Bankruptcy Court,
E.D. New York.

Aug. 22, 2005.

**50**

Hahn & Hessen LLP, New York, By Maria A. Arnott, Esq., John P. McCahey, Esq., for Securities Investor Protection Corporation.

Steinberg, Fineo, Berger & Fischoff, P.C., Woodbury, By Jeffrey L. Solomon, Esq., for Lisa Caponigro.

### MEMORANDUM DECISION DENYING LISA CAPONIGRO'S MOTION FOR PARTIAL SUMMARY JUDGMENT

ELIZABETH S. STONG, Bankruptcy Judge.

Lisa Caponigro ("Caponigro"), a defendant in this adversary proceeding (the "Adversary Proceeding") moves for partial summary judgment (the "Motion for Summary Judgment") dismissing the twenty-fifth through twenty-eighth claims for relief asserted in the amended complaint (the "Amended Complaint") of plaintiff Securities Investor Protection Corporation, as trustee for the liquidation of the business of Cambridge Capital, LLC ("SIPC" or the "Trustee"). In the twenty-fifth through twenty-eighth claims for relief, the Trustee asserts fraudulent conveyance claims against Caponigro, her husband Thomas Michael Rossi ("Rossi"), and Mountain Investments, L.P. ("Mountain Investments") under Section 542 of Title 11 of the United States Code (the "Bankruptcy Code"), and Sections 273 to 278 of New York's Debtor and Creditor Law (the "DCL"). The Trustee seeks a judgment setting aside and voiding the transfer by Rossi of his personal residence located in Dix Hills, New York (the "Dix Hills House") to Mountain Investments, and Mountain Investments' transfer of the Dix Hills House to Caponigro. Caponigro substantially denies, or denies knowledge or information sufficient to form a belief as to the truth of, the allegations set forth in the Trustee's twenty-fifth through twenty-eighth claims for relief. *See* Amended Answer of Lisa Caponigro, Docket Entry 41.

Hearings on the Motion for Summary Judgment were held on November 23, 2004, January 4, 2005, April 29, 2005, and June 24, 2005, at which counsel for the Trustee and Caponigro appeared and were heard. After consideration of the submissions, the arguments of counsel, and the entire record before the Court, for the reasons set forth below, the Motion for Summary Judgment is denied.

### Jurisdiction

This Court has jurisdiction over this proceeding pursuant to 28 U.S.C.

§§ 1334(b) and 157(b)(2) and 15 U.S.C. §§ 78eee(b)(2)(A) and (b)(4). The following are the Court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, as made applicable herein by Bankruptcy Rule 7052.

### Background
*Cambridge Capital, LLC*

The Trustee alleges that Cambridge Capital, LLC ("Cambridge" or the "Debtor") was organized as a limited liability company under the laws of the State of New York, and until its demise in mid-July 2000, was a registered broker-dealer purchasing, selling, and trading securities to and on behalf of its customers as well as its own account. Amended Complaint ¶ 10. Cambridge was registered with the United States Securities and Exchange Commission ("SEC") and was a member of SIPC, the National Association of Securities Dealers, Inc., and the Municipal Securities Rulemaking Board. *Id.*

The record shows that Rossi was the principal owner and manager of Cambridge and its parent and holding company, Frances Thomas, LLC d/b/a Cambridge Holding ("Frances Thomas"). Declaration of John P. McCahey, dated July 1, 2004 ("McCahey Decl."), Exh. 1 (testimony of Rossi) at 117:15–18; 36:12–19.[1] *See* Memorandum of Law in Opposition to Defendant Caponigro's Motion for Summary Judgment ("Trustee's Mem.") at 2. Rossi and Frances Thomas were the sole members of Cambridge. *Id.* Rossi owns an approximate 85 percent membership interest in Frances Thomas, and a small group of private investors and members owns the balance. *Id.* Rossi was also the sole manager of Frances Thomas from its formation until Frances Thomas became defunct. McCahey Decl., Exh. 1 (testimony of Rossi) at 68:15–24.

The Trustee alleges that as the sole manager of Cambridge and Frances Thomas, Rossi was responsible for overseeing Cambridge's daily operations. Amended Complaint ¶ 14. *See* Trustee's Mem. at 2. The Trustee also alleges that Rossi was the only individual authorized to sign checks and authorize transfers from business checking accounts maintained by Cambridge and Frances Thomas at Chase Manhattan Bank (the "Cambridge Chase Account" and the "Frances Thomas Chase Account"). Amended Complaint ¶ 43. *See* Trustee's Mem. at 2.

*Procedural History*

On January 24, 2001, the Trustee filed a complaint against Cambridge in the United States District Court for the Eastern District of New York. *See* Civil Docket, Case No. 01–cv–00425, Docket Entry 1. On February 2, 2001, the District Court entered an order upon Cambridge's consent granting the Trustee's application for the issuance of a protective decree adjudicating that the customers of Cambridge were in need of the protection afforded by the Securities Investor Protection Act of 1970 ("SIPA"). Civil Docket, Case No. 01–cv–00425, Docket Entry 7; Amended Complaint ¶ 2. Pursuant to the order, the District Court appointed the Trustee for the purpose of liquidating Cambridge's business under SIPA Section 78eee(b)(3), implemented the automatic stay of Section 362 of the Bankruptcy Code, and removed the liquidation to this Court. *See* Civil Docket, Case No. 01–cv–00425, Docket Entry 7; Amended Complaint ¶ 3. In accordance with SIPA Section 78fff(b), this SIPA proceeding is being conducted, to the extent consistent with SIPA, as a liqui-

---

1. References to McCahey Decl., Exh. 1 are to pages of the transcript of Rossi's deposition taken on September 26, 2002, and October 24, 2002, by the Trustee.

dation proceeding under Bankruptcy Code Chapters 1, 3, and 5 and Subchapters I and II of Chapter 7. *See* 15 U.S.C. § 78fff(b).

On January 29, 2003, the Trustee commenced this Adversary Proceeding by filing the original complaint with the Court. Adversary Docket Entry 1. In that complaint, the Trustee seeks avoidance and recovery of certain alleged fraudulent transfers made by Cambridge to certain members of Cambridge and members and affiliates of Frances Thomas, and seeks to set aside and recover certain alleged fraudulent transfers made by Frances Thomas to certain of its members and their affiliates at a time when Frances Thomas was allegedly insolvent and indebted to Cambridge in the amount of approximately $3.2 million. *Id.* On April 29, 2003, the Trustee moved to amend its complaint to add as defendants Rossi's father Robert Rossi, Rossi's grandmother Louise Lavino, and Mountain Investments, a New York limited partnership formed on June 6, 2000, comprised of Rossi as general partner and the Rossi Family Trust and Rossi as its limited partners. The Trustee also sought to add additional fraudulent conveyance claims against Rossi, Caponigro, Mountain Investments, Robert Rossi, and Lavino, relating to Rossi's transfer of $557,382 to Mountain Investments, Rossi's transfer of the Dix Hills House to Mountain Investments, and Mountain Investments' transfer of the Dix Hills House to Caponigro. Adversary Docket Entry 10. By order dated June 9, 2003, the Trustee's motion was granted. Adversary Docket Entry 37.

*The Motion for Summary Judgment*

On June 3, 2004, Caponigro filed the Motion for Summary Judgment seeking an order dismissing the twenty-fifth through twenty-eighth claims for relief asserted in the Amended Complaint. In support of the Motion for Summary Judgment, Caponigro filed a Memorandum of Law dated May 27, 2004 (the "Caponigro Mem."), a Statement of Undisputed Material Facts dated May 21, 2004, the affidavit sworn to on May 18, 2004, of Lisa Caponigro (the "Caponigro Aff."), the affidavit sworn to on May 25, 2004, of Scott Eisenmesser (the "Eisenmesser Aff."), the declaration dated January 10, 2005, of Jeffrey L. Solomon to place additional evidence before the Court (the "Solomon Decl."), and the affidavit sworn to on May 6, 2005, of Thomas Michael Rossi to place further evidence before the Court (the "Rossi Aff.").

On July 2, 2004, in opposition to the Motion for Summary Judgment, the Trustee filed a Memorandum of Law dated July 1, 2004 (as defined above, the "Trustee's Mem."), a Counter–Statement of Material Facts dated July 1, 2004, and the declaration dated July 1, 2004, of John P. McCahey (as defined above, the "McCahey Decl."). On September 17, 2004, the Trustee filed the declaration dated September 16, 2004, of Maria A. Arnott to place new evidence before the Court (the "September 16 Arnott Decl."). On February 3, 2005, the Trustee filed the affirmation dated January 10, 2005, of Maria A. Arnott in reply to the Solomon Declaration (the "January 31 Arnott Affirm."), and on May 20, 2005, the Trustee filed the affirmation dated May 19, 2005, of Maria A. Arnott in reply to the Rossi Affidavit (the "May 19 Arnott Affirm."). As noted above, hearings were held on the Motion for Summary Judgment on November 23, 2004, January 4, 2005, April 29, 2005, and June 24, 2005.

*The Trustee's Allegations of Diversion of Cambridge's Assets*

The Trustee alleges that sometime after July 1999, during the course of a routine examination of Cambridge, the SEC and the NASD Regulation, Inc. ("NASDR") questioned certain self-described "consult-

ing" payments totaling over $717,169, made by Cambridge between April and July 1999, including payments to members of Frances Thomas and individuals and entities affiliated with them. Amended Complaint ¶ 45. *See* McCahey Decl., Exh. 2 (letter dated October 21, 1999, from NASDR to Rossi); Trustee's Mem. at 2–3.

The Trustee also alleges that by letter dated October 21, 1999, NASDR advised Rossi that Cambridge had not produced previously requested documentation explaining and justifying these payments. Amended Complaint ¶ 46. *See* McCahey Decl., Exh. 2 (letter dated October 21, 1999, from NASDR to Rossi). The Trustee argues that Cambridge did not provide the documentation requested by NASDR. Trustee's Mem. at 3. The Trustee also argues that during this time, one of Cambridge's investors, Danielle Bellanger, threatened legal action against Rossi, Cambridge, and Frances Thomas based upon their alleged breaches of certain agreements. McCahey Decl., Exh. 3 (affidavit sworn to on April 19, 2002, of Danielle Bellanger); Trustee's Mem. at 3. In July 2000, Bellanger commenced a lawsuit against Rossi, Cambridge, and Frances Thomas in New York Supreme Court seeking to recover more than $650,000 that she advanced to Cambridge and Frances Thomas (the "Bellanger Lawsuit"). McCahey Decl., Exh. 4 (summons and complaint in Bellanger Lawsuit); Trustee's Mem. at 3. The record shows that almost three years later, on November 23, 2003, Rossi's motion to dismiss the Bellanger Lawsuit was granted without prejudice. Solomon Decl., Exhs. G, H (notice of entry and judgment dated November 21, 2003, in Bellanger Lawsuit; transcript of hearing held on November 7, 2003, in Bellanger Lawsuit).

The Trustee further alleges that in February 2000, it became apparent to Rossi that Cambridge's business was deteriorating, and he considered closing Cambridge or finding a buyer for the business. Amended Complaint ¶ 47. *See* McCahey Decl., Exh. 1 (testimony of Rossi) at 26:12–20; Trustee's Mem. at 3. In mid-July 2000, Cambridge ceased doing business, and on or about July 13, 2000, Cambridge filed a Broker–Dealer Withdrawal ("BDW"). Amended Complaint ¶ 48. *See* McCahey Decl., Exh. 1 (testimony of Rossi) at 23:9–13; 24:18–23.

The Trustee alleges that between January 2000 and July 2000, $6.7 million was transferred from brokerage accounts maintained by Cambridge into the Cambridge Chase Account. Amended Complaint ¶ 56. *See* McCahey Decl., Exh. 5 (Cambridge Chase Account bank statements); Trustee's Mem. at 3. The Trustee also alleges that during that same period, approximately $1.7 million of those funds was transferred from the Cambridge Chase Account into the Frances Thomas Chase Account. Amended Complaint ¶ 56. *See* McCahey Decl., Exh. 6 (Frances Thomas Chase Account bank statements); Trustee's Mem. at 3.

The Trustee alleges that, at a time when Frances Thomas was insolvent and indebted to Cambridge for more than $3.1 million, Rossi authorized Frances Thomas to transfer more than $769,000, without fair consideration, to certain Frances Thomas members, to his personal account at Chase Manhattan Bank, to Caponigro, and to third parties on his behalf and for his benefit. Amended Complaint ¶¶ 57, 58, 64, 68–70. *See* McCahey Decl., Exhs. 7, 9 (copies of checks payable to Lisa Caponigro dated December 28, 1999, and January 18, 2000, and to Nassau–Suffolk Landscaping dated March 30, 2000, May 16, 2000, and June 21, 2000); Trustee's Mem. at 4. The Trustee also alleges that Rossi authorized Cambridge to make certain transfers

totaling $35,594.86, to third parties on his behalf or for his benefit. Amended Complaint ¶ 73.

The Trustee alleges that in the first half of 2000, as part of an "understanding" between Frances Thomas and Best USA, Inc. ("Best USA"), a company owned and operated by Rossi's cousin Jeff Lavino, Rossi authorized the transfer of at least $118,000 to Best USA as a capital contribution. Amended Complaint ¶ 60. *See* McCahey Decl., Exh. 10 (schedule of transfers from Frances Thomas Chase Account to Best USA); Trustee's Mem. at 4. In exchange, Rossi and certain Frances Thomas members received Best USA shares. Amended Complaint ¶ 61. *See* Trustee's Mem. at 4. The Trustee also alleges that this transfer was made without fair consideration and at a time when Frances Thomas was indebted to Cambridge. Amended Complaint ¶ 63. *See* Trustee's Mem. at 4. The Trustee argues that Best USA entered into a joint venture agreement with Caponigro, under which Best USA agreed to pay Caponigro at least $100,000. Trustee's Mem. at 4; McCahey Decl., Exh. 11 (Joint Venture Agreement dated July 10, 2000, between Best USA and Caponigro). The record reflects that by Joint Venture Dissolution Agreement dated August 14, 2001, between Best USA and Caponigro, the joint venture agreement was dissolved upon Best USA's agreement to pay Caponigro $300,000 for her rights and interests in a website entity. McCahey Decl., Exh. 12 (Joint Venture Dissolution Agreement dated August 14, 2001).

The Trustee alleges that on July 12, 2000, the day before Cambridge filed its BDW and ceased doing business, Rossi transferred $950,000 from the Cambridge Chase Account into the Frances Thomas Chase Account. Amended Complaint ¶ 56. *See* McCahey Decl., Exh. 6 (Frances Thomas Chase Account bank statements); Trustee's Mem. at 4. The Trustee also alleges that on July 13, 2000, Rossi transferred $859,569.86 of these funds from the Frances Thomas Chase Account into a third account at Chase Manhattan Bank under the name of Chess Match, Inc. (the "Chess Match Chase Account"), and on July 19, 2000, he transferred an additional $49,000 from the Frances Thomas Chase Account into the Chess Match Chase Account. Amended Complaint ¶¶ 80, 81. *See* May 19 Arnott Affirm., Exh. 30 (Chess Match Chase Account bank statements); Trustee's Mem. at 4–5. Rossi testified that Chess Match was formed to protect the assets of Frances Thomas from seizure by a creditor. McCahey Decl., Exh. 1 (testimony of Rossi) at 329:24–332:22.

The Trustee alleges that on July 19, 2000, Rossi authorized the transfer of $557,382 of Cambridge's funds in the Chess Match Chase Account to an account at Chase Manhattan Bank under the name of Mountain Investments (the "Mountain Investments Chase Account"). Amended Complaint ¶ 86. *See* McCahey Decl., Exh. 13 (Chess Match Chase Account bank statement); September 16 Arnott Decl., Exh. 24 (Mountain Investments Chase Account bank statements).

*The Trustee's Allegations of Fraudulent Transfers of the Dix Hills House*

The Trustee alleges that at a time when Rossi was already indebted to Cambridge's creditors, he transferred the Dix Hills House to Mountain Investments and, as a principal of Mountain Investments, he transferred the Dix Hills House to Caponigro. Amended Complaint ¶¶ 173, 174. The Trustee also alleges that these transfers were made with actual intent to hinder, delay, and defraud Rossi's creditors, including Cambridge. Amended Complaint ¶ 175. The Trustee further alleges that Rossi received less than fair consider-

ation in exchange for the transfers, that Rossi was rendered insolvent thereby, that the transfers were made at a time when Rossi was engaged in a business or transaction, or was about to engage in a business or transaction for which any property remaining in his hands after the transfers constituted unreasonably small capital, and that Rossi made the transfers with the intent or belief that he would incur debts beyond his ability to pay as said debts matured. Amended Complaint ¶¶ 179, 180, 183, 186.

The Trustee argues:

Apart from pillaging the assets of Cambridge, Rossi also sought to protect his personal assets (namely, his residence) from any potential judgment that might be entered against him. Rossi originally purchased the Dix Hills House in April 1999 for a sale price of $711,500. On June 6, 2000, just three weeks before Cambridge filed its BDW and Rossi transferred almost $1 million from Cambridge's account to the newly formed Chess Match account, and at a time when Rossi was facing claims from third-parties, Rossi transferred legal title to the Dix Hills House from his name into the name of his limited partnership, Mountain Investments. No transfer tax was paid on the transfer of the Dix Hills House to Mountain Investments and the House remained occupied by Rossi and/or his family members. Approximately one year later, on August 31, 2001, just weeks before his marriage to Caponigro, Rossi (on behalf of Mountain Investments) conveyed title to the Dix Hills House to Caponigro.

Trustee's Mem. at 6.

By its twenty-fifth claim for relief, the Trustee seeks to set aside as actually fraudulent the transfers of the Dix Hills House by Rossi to Mountain Investments, and by Mountain Investments to Caponigro, pursuant to Section 542 of the Bankruptcy Code and DCL Sections 276 and 278. By its twenty-sixth, twenty-seventh, and twenty-eighth claims for relief, the Trustee seeks to set aside as constructively fraudulent the transfers of the Dix Hills House, pursuant to Section 542 of the Bankruptcy Code and DCL Sections 273, 274, 275, and 278.

## DISCUSSION

### The Standard for Summary Judgment

Caponigro seeks summary judgment on the Trustee's twenty-fifth, twenty-sixth, twenty-seventh, and twenty-eighth claims for relief. Federal Rule of Civil Procedure 56, made applicable to this adversary proceeding by Bankruptcy Rule 7056, provides that summary judgment is appropriate when " 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.' " *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting FED. R. CIV. P. 56(c)); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "A fact is material only if it affects the result of the proceeding and a fact is in dispute only when the opposing party submits evidence such that a trial would be required to resolve the differences." *Hassett v. Altai, Inc. (In re CIS Corp.)*, 214 B.R. 108, 118 (Bankr.S.D.N.Y.1997).

The moving party has the burden of demonstrating the absence of any genuine issue of material fact, and all of the inferences to be drawn from the underlying facts must be viewed by the Court in the

light most favorable to the party opposing the motion. *See Anderson*, 477 U.S. at 249, 106 S.Ct. 2505. To defeat a motion for summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586, 106 S.Ct. 1348. Rather, it must present "significant probative evidence" that a genuine issue of fact exists. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505.

And where the plaintiff's claim must be established by clear and convincing evidence, as with the Trustee's twenty-fifth claim for relief under DCL Section 276, then "the issue is whether, with all conflicts in the evidence resolved and all reasonable inferences drawn in favor of plaintiffs, the record contains sufficient evidence from which a reasonable jury could find actual fraud under the clear and convincing standard." *Lippe v. Bairnco Corp.*, 249 F.Supp.2d 357, 374 (S.D.N.Y.2003) (citing *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505). But, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," there is no genuine issue of fact for trial and summary judgment is appropriate. *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348. *See Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir.2000), *cert. denied*, 540 U.S. 811, 124 S.Ct. 53, 157 L.Ed.2d 24 (2003).

*Whether the Trustee Has Standing To Assert These Claims*

Caponigro argues that all of the Trustee's fraudulent transfer claims must fail because the Trustee does not allege the existence of an actual creditor with standing to void the transfer at the time of the transaction pursuant to Section 544(b) of the Bankruptcy Code, and because the Dix Hills House is not part of Cambridge's estate. Caponigro Aff. ¶ 1; Caponigro Mem. at 9–11. Caponigro also argues:

[T]here are *no facts pleaded or in existence* to show: (i) that Rossi was indebted to Cambridge, its creditors, or anyone else when he transferred the [Dix Hills House] to Mountain; (ii) that Rossi had no creditors, actual or potential which related to the business of Cambridge; (iii) that any potential claims against Cambridge that may have existed at the time, either ripened, were of the type and nature which, if not covered by insurance, would comprise debts of Tom Rossi; (iv) that Caponigro knew or had any reason to know that the purchase was not arm's length and for fair consideration; or (v) that the purchase price was a reasonably equivalent value pursuant to the N.Y. DCL.

Caponigro Mem. at 10–11 (emphasis in original).

The Trustee responds that its twenty-fifth, twenty-sixth, twenty-seventh, and twenty-eighth claims for relief against Caponigro are brought under Section 542, not Section 544, of the Bankruptcy Code. Section 542(b) provides in relevant part that "an entity that owes a debt that is property of the estate and that is matured, payable on demand, or payable on order, shall pay such debt to, or on the order of, the trustee . . . ." 11 U.S.C. § 542(b). The Trustee argues that "unlike Section 544 wherein the trustee is granted the power to act as a hypothetical lien creditor, Section 542 does not require proof of the existence of an actual creditor as a precursor to maintaining a claim." Trustee's Mem. at 10–11.

The Trustee further argues that "by way of the Amended Complaint, [it] has clearly alleged that Rossi owes a matured debt that is property of Cambridge's bankruptcy estate." Trustee's Mem. at 11. The Trustee argues:

Rossi, in his capacity as manager and chief executive officer of Cambridge,

systematically looted Cambridge in excess of $1.5 million in assets. To date, none of these funds have been recovered and SIPC has been compelled to cover losses in the accounts of Cambridge's customers in excess of $1.5 million. The Trustee now seeks a return of Cambridge's customer funds from Rossi and in conjunction therewith, the Trustee seeks a return of the assets Rossi has fraudulently transferred (including the Dix Hills House) in an attempt to frustrate the Trustee's enforcement [of its] eventual judgment.

Trustee's Mem. at 1.

■ Here, in its twenty-fifth to twenty-eighth claims for relief, the Trustee seeks to collect on a matured debt of $1.5 million that it alleges it is owed by Rossi by means of avoiding alleged fraudulent transfers made by Rossi to Caponigro, using Mountain Investments as the intermediary. *See* Trustee's Mem. at 13. " 'Matured' [debt] refers to 'debts that are presently payable, as opposed to those that are contingent and become payable only upon the occurrence of a certain act or event.' " *Porter–Hayden Co. v. First State Mgt. Group, Inc. (In re Porter–Hayden Co.)*, 304 B.R. 725, 732 (Bankr.D.Md. 2004) (quoting 5 COLLIER ON BANKRUPTCY ¶ 542.03 n. 1 (15th ed. rev. 2003)). And here, the source of the debt is the amount the Trustee has already paid to Cambridge's customers to cover losses in their accounts maintained with Cambridge. The Trustee seeks the " 'collection rather than the creation, recognition, or liquidation of a matured debt.' " *In re Porter–Hayden Co.*, 304 B.R. at 732 (quoting *In re Gulf Apparel Corp.*, 140 B.R. 593, 596 (M.D.Ga.1992)).

■ At this stage in the proceedings, Caponigro's denials of the Trustee's allegations do not divest the Trustee of standing or take the Trustee's claims outside of the scope of Section 542. As several courts have found, " 'it is not relevant that [all] the defendant[s] dispute the existence of the debt by, perhaps, denying the complaint's allegations, as long as these allegations state the existence of a mature debt.' " *Kenston Mgmt. Co. v. Lisa Realty Co. (In re Kenston Mgmt. Co.)*, 137 B.R. 100, 107–08 (Bankr.E.D.N.Y.1992) (quoting *In re Nat'l Enters., Inc.*, 128 B.R. 956, 959 (E.D.Va.1991)). *See also Corzin v. Rawson (In re Rawson)*, 40 B.R. 167, 169 (Bankr.N.D.Ohio 1984) ("The mere fact that the defendants deny these allegations [of a matured debt] does not take the trustee's action outside the scope of section 542(b)"). Nor, again at this stage in the proceedings, has Caponigro established that there is no genuine issue of material fact as to whether a matured debt exists. Accordingly, the Trustee has standing to assert these claims.

*The Motion for Summary Judgment on the Twenty–Fifth Claim for Relief—Actual Fraud*

■ Caponigro seeks summary judgment on the Trustee's twenty-fifth claim for relief which alleges that the transfers of the Dix Hills House by Rossi to Mountain Investments, and by Mountain Investments to Caponigro, were actually fraudulent under DCL Section 276. Caponigro argues that she is entitled to summary judgment because the Trustee has not shown "actual fraud" by "clear and convincing" evidence, and because she purchased the Dix Hills House from Mountain Investments at market value. Caponigro Mem. at 11–13.

Summary judgment on questions of fraudulent intent can pose significant obstacles for a moving party because of the difficulty in establishing a defendant's state of mind. The Second Circuit has observed that "[t]he intent of the parties to

the transaction 'is purely a question of fact.' ... Ordinarily, such issues are inappropriate for summary judgment." *Citizens Bank of Clearwater v. Hunt*, 927 F.2d 707, 711 (2d Cir.1991) (quoting *Tyers v. Coma*, 214 Conn. 8, 11, 570 A.2d 186, 188 (1990)) (citations omitted). *See also Breeden v. Bennett (In re Bennett Funding Group, Inc.)*, 220 B.R. 743, 756 (Bankr. N.D.N.Y.1997) (" 'Ordinarily, the issue of fraudulent intent cannot be resolved on a motion for summary judgment, being a factual question involving the parties' states of mind.' ") (quoting *Golden Budha Corp. v. Canadian Land Co. of America*, 931 F.2d 196, 201–02 (2d Cir.1991)); *New York v. North Storonske Cooperage Co.*, 174 B.R. 366, 390 (N.D.N.Y.1994) ("Summary judgment on a fraud claim of any kind is exceedingly rare due to the intent element, which, is almost always an issue of fact."). This is especially so where, as here, discovery is not complete, and the deposition of the moving party has not been taken.

By its twenty-fifth claim for relief under DCL Section 276,[2] the Trustee alleges that the transfers of the Dix Hills House by Rossi to Mountain Investments, and by Mountain Investments to Caponigro, were made with "actual intent to hinder, delay and defraud the creditors of Rossi, including Cambridge." The Trustee alleges:

> [A]t a time when Rossi was already indebted to the creditors of Cambridge, Rossi transferred ... the Dix Hills House to Mountain Investment, a partnership in which Rossi is a principal. ... Rossi, as a principal of Mountain Investment, transferred the Dix Hills House to Caponigro, his wife. ... The House

Transfers made by Rossi to Mountain Investment and Caponigro were made with actual intent to hinder, delay and defraud the creditors of Rossi, including Cambridge. ... Mountain Investment and Caponigro knew the House Transfers were intended to hinder, delay and defraud Rossi's creditors, including Cambridge. ... By virtue of the foregoing, the House Transfers are voidable as fraudulent conveyances under DCL § 276.

Amended Complaint ¶¶ 173–77.

■ In order to prevail on its twenty-fifth claim for relief under DCL Section 276, the Trustee must prove by clear and convincing evidence that Rossi conveyed the Dix Hills House with the actual intent to hinder, delay, or defraud his creditors. *See MFS/Sun Life Trust–High Yield Series v. Van Dusen Airport Servs. Co.*, 910 F.Supp. 913, 934–35 (S.D.N.Y.1995) ("The burden of proving actual intent is on the party seeking to set aside the conveyance. ... Such intent must be demonstrated by clear and convincing evidence."). *See also HBE Leasing Corp. v. Frank*, 61 F.3d 1054, 1059 n. 5 (2d Cir.1995) ("[T]o prove actual fraud under § 276, a creditor must show intent to defraud on the part of the transferor.").

■ But the Trustee must bear that burden in order to prevail at trial, not to defeat this Motion for Summary Judgment. At this stage in the proceedings, to prevail on this Motion for Summary Judgment, Caponigro, as the moving party, must demonstrate the absence of any genuine issue of material fact as to Rossi's intent in transferring the Dix Hills House to Mountain Investments, and Rossi's in-

---

**2.** Section 276 of the DCL provides:
Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or

future creditors, is fraudulent as to both present and future creditors.
N.Y. DEBT. & CRED. LAW § 276 (McKinney 2001).

tent, as general partner of Mountain Investments, in transferring the Dix Hills House from Mountain Investments to Caponigro. Put another way, for Caponigro to succeed, the Court must conclude:

> [W]ith all conflicts in the evidence resolved and all reasonable inferences drawn in favor of [the Trustee], ... a reasonable jury could [not] find actual fraud under the clear and convincing standard. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). ("[C]lear-and-convincing standard of proof should be taken into account in ruling on summary judgment motions.").

*Lippe*, 249 F.Supp.2d at 374. *See also Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348.

■ Because actual intent to hinder, delay, or defraud is rarely susceptible to direct proof, courts have found:

> [Actual intent] may be gleaned from the circumstances surrounding the alleged fraudulent transaction. *See U.S. v. McCombs*, 30 F.3d 310, 328 (2d Cir.1994) (citing *In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983*, 731 F.2d 1032, 1041 (2d Cir.1984)) (The court held that under § 276, the "fraudulent nature of a conveyance may be inferred from the relationship among the parties to the transaction and the secrecy of the sale, or from inadequacy of consideration and hasty, unusual transactions.").

*Securities Investor Prot. Corp. v. Stratton Oakmont, Inc.*, 234 B.R. 293, 315 (Bankr. S.D.N.Y.1999).

■ As the court observed in *MFS/Sun Life Trust–High Yield Series*:

> [C]ourts will consider "badges of fraud" which are circumstances that accompany fraudulent transfers so commonly that their presence gives rise to an inference of intent.... Such factors include (1) a close relationship among the parties to the transaction; (2) a secret and hasty transfer not in the usual course of business; (3) inadequacy of consideration; (4) the transferor's knowledge of the creditor's claim and the transferor's inability to pay it; (5) the use of dummies or fictitious parties; and (6) retention of control of property by the transferor after the conveyance.... Depending on the context, badges of fraud will vary in significance, though the presence of multiple indicia will increase the strength of the inference.

*MFS/Sun Life Trust–High Yield Series*, 910 F.Supp. at 935 (citations omitted).

The Trustee argues that at least five "badges of fraud" show actual intent on the part of Rossi to "hinder, delay, or defraud" his creditors in making these transfers. First, the Trustee argues that "[t]he transfers were interfamilial (*i.e.*, Rossi was the general partner of Mountain Investments and the husband of Caponigro)." Trustee's Mem. at 13. The record reflects that Rossi was the general partner of Mountain Investments. McCahey Decl., Exh. 15 (Mountain Investments certificate of limited partnership). The Trustee also notes that the August 31, 2001, transfer of the Dix Hills House from Mountain Investments to Caponigro occurred "just weeks before [Rossi's] marriage to Caponigro." McCahey Decl., Exh. 1 (testimony of Rossi) at 341:3–4; Trustee's Mem. at 6.

Second, the Trustee argues:

> The transfers were secret, hasty and unusual in that Rossi divested himself of ownership of his primary asset. Moreover, the timing of the transfer was suspicious because it occurred (a) at a time when Rossi was aware that Cambridge's business was deteriorating ... (b) when Rossi had made the decision to close Cambridge ... and (c) at a time when at least one [of] Cambridge's in-

vestors was threatening legal action against Rossi in an amount in excess of $600,000.

Trustee's Mem. at 13–14. The record reflects that Rossi transferred the Dix Hills House to Mountain Investments on June 6, 2000. *See* McCahey Decl., Exh. 16 (deed dated June 6, 2000, from Rossi to Mountain Investments). The record also shows that in February 2000, approximately four months before that transfer, Rossi concluded that Cambridge's business was deteriorating and was considering closing or finding a buyer for the business. *See* McCahey Decl., Exh. 1 (testimony of Rossi) at 26:12–20. The record further reflects that approximately five to six weeks after the transfer to Mountain Investments, in mid-July 2000, Cambridge ceased doing business, and on or about July 13, 2000, Cambridge filed its BDW. *See* McCahey Decl., Exh. 1 (testimony of Rossi) at 23:9–13; 24:18–23. Finally, the record reflects that the Bellanger Lawsuit, which sought more than $600,000 from Rossi, Cambridge, and Frances Thomas, was commenced in July 2000. *See* McCahey Decl., Exh. 4 (summons and complaint in Bellanger Lawsuit).

Third, the Trustee argues that "[t]he consideration was inadequate (indeed, nonexistent). Information obtained from the Suffolk County Clerk's office indicates that no apparent consideration or transfer tax was paid upon the transfer of title from Rossi to Mountain Investments." Trustee's Mem. at 14. The deed conveying the Dix Hills House from Rossi to Mountain Investments does not indicate that transfer tax was paid. *See* McCahey Decl., Exh. 16 (deed dated June 6, 2000, from Rossi to Mountain Investments). The Trustee also notes that consideration in the form of "love and affection" is not considered "fair consideration" under New York law. Trustee's Mem. at 14 (citing Eisenmesser Aff. ¶ 5). *See, e.g., Apple*

*Bank for Savings v. Contaratos,* 204 A.D.2d 375, 376, 612 N.Y.S.2d 51, 52 (2d Dep't 1994).

Fourth, the Trustee argues that "Rossi transferred the Dix Hills House with actual knowledge of the claims against him by Cambridge, its creditors and customers and as part of his overall scheme to divert assets that could be used to pay his potential creditors." Trustee's Mem. at 14. *See* McCahey Decl., Exh. 1 (testimony of Rossi) at 331:12–332:13.

Finally, the Trustee argues that "[e]xcept for the transfer of title, no change at all occurred in the possession and control of the Dix Hills House by Rossi. The retention of control over property following a conveyance is an indication that such conveyance was fraudulent." Trustee's Mem. at 14–15. *See* McCahey Decl., Exh. 1 (testimony of Rossi) at 5:14–21.

Caponigro further argues that she is entitled to summary judgment dismissing the twenty-fifth claim for relief because even if Rossi's transfer of the Dix Hills House to Mountain Investments was tainted by fraud, the transfer by Mountain Investments to Caponigro is valid because she paid fair market value to Mountain Investments for the Dix Hills House. Caponigro Mem. at 13. As discussed below, Caponigro has not shown the absence of a genuine issue of material fact as to whether her purchase of the Dix Hills House from Mountain Investments was made at market value and for a "fair equivalent." *See* pp. 67–69, *infra.*

■ And in all events, even if Caponigro's assertion that she paid fair market value for the Dix Hills House could be resolved in her favor at this stage in the proceedings, it would not eliminate the need to consider Rossi's intent under DCL Section 276. As courts in this circuit have found:

[A] transfer may be fraudulent under § 276 even if the transferor pays "fair consideration," as long as the transfer was made with "actual intent to hinder, delay, or defraud." In other words, the payment of fair consideration does not preclude liability under § 276 if the requisite intent is proven.

*Lippe,* 249 F.Supp.2d at 374 (quoting *HBE Leasing Corp. v. Frank,* 48 F.3d 623, 639 (2d Cir.1995)). *See also Sharp Int'l Corp. v. State Street Bank and Trust Co. (In re Sharp Int'l Corp.),* 403 F.3d 43, 56 (2d Cir.2005) ("[W]here actual intent to defraud creditors is proven, the conveyance will be set aside regardless of the adequacy of consideration given.") (quotation omitted).

Based on the entire record, the Court concludes that the Trustee has identified several possible "badges of fraud" that, if proven, would lend support to an inference of actual intent to hinder, delay, or defraud on the part of Rossi, namely, the close relationship between Rossi and Caponigro, the timing of Rossi's transfer of the Dix Hills House to Mountain Investments with respect to Rossi's knowledge of possible claims against him, the sufficiency of consideration in Rossi's transfer of the Dix Hills House to Mountain Investments and Caponigro's purchase of the property from Mountain Investments, and Rossi's retention of control over the Dix Hills House. For the same reasons, the Court concludes that Caponigro has not shown that "with all conflicts in the evidence resolved and all reasonable inferences drawn in favor of [the Trustee] ... a reasonable jury could [not] find" for the Trustee on these issues. *See Lippe,* 249 F.Supp.2d at 374. Accordingly, Caponigro's Motion for Summary Judgment dismissing the twenty-fifth claim for relief is denied.

*The Motion for Summary Judgment on the Twenty–Sixth, Twenty–Seventh, and Twenty–Eighth Claims for Relief—Constructive Fraud*

Caponigro seeks summary judgment on the Trustee's twenty-sixth, twenty-seventh, and twenty-eighth claims for relief which allege that the transfers of the Dix Hills House by Rossi to Mountain Investments, and by Mountain Investments to Caponigro, are constructively fraudulent under DCL Sections 273, 274, and 275. As the Second Circuit has found, under DCL Sections 273, 274, and 275:

[A] conveyance by a debtor is deemed constructively fraudulent if it is made without "fair consideration," and (*inter alia*) if one of the following conditions are met: (i) the transferor is insolvent or will be rendered insolvent by the transfer in question, DCL § 273; (ii) the transferor is engaged in or is about to engage in a business transaction for which its remaining property constitutes unreasonably small capital, DCL § 274; or (iii) the transferor believes that it will incur debt beyond its ability to pay, DCL § 275.

*In re Sharp Int'l.,* 403 F.3d at 53.

New York's Appellate Division, Second Department has defined "constructive fraud" under the DCL as:

a breach of a duty which, irrespective of moral guilt and intent, the law declares fraudulent because of its tendency to deceive, to violate a confidence or to injure public or private interests which the law deems worthy of special protection.

*Southern Indus. v. Jeremias,* 66 A.D.2d 178, 182, 411 N.Y.S.2d 945, 948 (App. Div.2d Dep't 1978).

To establish its twenty-sixth claim for relief under DCL Section 273,[3] the Trustee

---

3. Section 273 of the DCL provides:

Every conveyance made and every obli-

gation incurred by a person who is or will

must show that Rossi conveyed the Dix Hills House to Mountain Investments, and Mountain Investments conveyed the Dix Hills House to Caponigro, without fair consideration, and that Rossi was thereby rendered insolvent. N.Y. DEBT. & CRED. LAW § 273 (McKinney 2001).

To establish its twenty-seventh claim for relief under DCL Section 274,[4] the Trustee must show that Rossi conveyed the Dix Hills House to Mountain Investments, and Mountain Investments conveyed the Dix Hills House to Caponigro, without fair consideration, and that the transfers were made when Rossi was engaged in, or about to be engaged in, a business or transaction for which the property remaining after the transaction is an unreasonably small capital. N.Y. DEBT. & CRED. LAW § 274 (McKinney 2001).

To establish its twenty-eighth claim for relief under DCL Section 275,[5] the Trustee must show that Rossi conveyed the Dix Hills House to Mountain Investments, and Mountain Investments conveyed the Dix Hills House to Caponigro, without fair consideration, and that Rossi made the transfers with the intent or belief that he would incur debts beyond his ability to pay as said debts matured. N.Y. DEBT. & CRED. LAW § 275 (McKinney 2001).

A creditor who seeks to avoid a transfer under any of these provisions must show the absence of fair consideration by a preponderance of the evidence. *See McCombs*, 30 F.3d at 324; *Lippe*, 249 F.Supp.2d at 378. At the same time, where the transferee is in possession of "the evidentiary facts as to the nature and value of the consideration" then, under New York law "the burden of coming forward with evidence on the fairness of the consideration shifts to the transferee.... Moreover, in an intrafamily transaction there is a heavier burden on the transferee to establish fair consideration for the transfer." *Bombardier Capital, Inc. v. Richfield Housing Center, Inc.*, 1994 WL 118294 at *11 (S.D.N.Y.1994) (citations omitted). *See also Gasser v. Infanti Int'l, Inc.*, 353 F.Supp.2d 342, 354 (E.D.N.Y. 2005) ("[I]n cases where a conveyance has been made from one family member to another and the facts relating to the type of consideration are within their exclusive control, the defendant has the burden of proving the adequacy of the consideration.")

Of course, these burdens on the creditor must be met at the time of trial. On this Motion for Summary Judgment, the burden is on Caponigro, as the moving party, to show that there is no genuine

---

4. Section 274 of the DCL provides:

Every conveyance made without fair consideration when the person making it is engaged or is about to engage in a business or transaction for which the property remaining in his hands after the conveyance is an unreasonably small capital, is fraudulent as to creditors and as to other persons who become creditors during the continuance of such business or transaction without regard to his actual intent.
N.Y. DEBT. & CRED. LAW § 274 (McKinney 2001).

5. Section 275 of the DCL provides:

Every conveyance made and every obligation incurred without fair consideration when the person making the conveyance or entering into the obligation intends or believes that he will incur debts beyond his ability to pay as they mature, is fraudulent as to both present and future creditors.
N.Y. DEBT. & CRED. LAW § 275 (McKinney 2001).

be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration.
N.Y. DEBT. & CRED. LAW § 273 (McKinney 2001).

issue of material fact as to an essential element of the Trustee's claim, so that she is entitled to judgment as a matter of law. *See Anderson,* 477 U.S. at 249, 106 S.Ct. 2505.

In her Motion for Summary Judgment, Caponigro argues that there is no genuine issue of material fact as to whether Rossi's transfer of the Dix Hills House to Mountain Investments, and Mountain Investments' transfer of the Dix Hills House to her, were made with adequate consideration and in good faith.  For these reasons, she argues, she is entitled to summary judgment on these claims for relief.[6]  Caponigro affirms that:

> [The Dix Hills House] was acquired by my seller, Mountain Investments, from [Rossi] as part of an estate plan.  According to the public record, Rossi bought the [Dix Hills House] from the builder for $711,500.00, taking out a $400,000.00 mortgage .... Accordingly, not only did Mountain *not* give me the [Dix Hills House] at what the trustee implies was a "special family discount", I paid *full market value and nearly 20% more than Rossi bought it for.*

Caponigro Aff. ¶ 9 (emphasis in original).

"Fair consideration" is defined in DCL Section 272 as follows:

> Fair consideration is given for property, or obligation,
>
> a. When in exchange for such property, or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied, or

b. When such property, or obligation is received in good faith to secure a present advance or antecedent debt in amount not disproportionately small as compared with the value of the property, or obligation obtained.

N.Y. DEBT. & CRED. LAW § 272 (McKinney 2001).

As the language of the statute provides, "fair consideration" has two components.  These are the fair equivalency of the consideration given and good faith. Fair equivalence "does not require dollar-for-dollar equivalence; consideration can be fair even if it is less than the value of the transferred property, as long as it is an amount that is not 'disproportionately small' as compared to the value of the transferred property." *Lippe,* 249 F.Supp.2d at 377.

The "good faith" component of DCL Section 273 has been interpreted by New York's Appellate Division, Second Department as follows:

> [A]  person seeking to set aside a conveyance upon the basis of lack of good faith must prove that one or more of the following factors is lacking: (1) an honest belief in the propriety of the activities in question; (2) no intent to take unconscionable advantage of others; and (3) no intent to, or knowledge of the fact that the activities in question will hinder, delay, or defraud others.  The term "good faith" does not merely mean the opposite of the phrase "actual intent to defraud".  That is to say, an absence of fraudulent intent does not mean that the transaction was necessarily entered into

---

**6.**  Caponigro also argues that these claims for relief suffer from the "threshold deficiencies" of standing to sue advanced with respect to the twenty-fifth claim for relief.  Caponigro Mem. at 14.  For the reasons discussed above, the Court is not persuaded by these arguments.  *See* pp. 56–57, *supra.*  Caponigro further argues that these claims for relief should be dismissed because they are generally "devoid of proof."  *See* Caponigro Mem. at 16–19.  At this stage in the proceedings, this is not a sufficient basis to dismiss these claims.

in good faith. The lack of good faith imports a failure to deal honestly, fairly and openly.

*Southern Indus.,* 66 A.D.2d at 183, 411 N.Y.S.2d at 949.

■ As the Second Circuit has observed:

[Where] a transferee has given equivalent value in exchange for the debtor's property, the statutory requirement of "good faith" is satisfied if the transferee acted without either actual or constructive knowledge of any fraudulent scheme.

*HBE Leasing,* 48 F.3d at 636.

■ "The 'good faith' in § 272 is the good faith of the transferee .... By contrast, to prove actual fraud under § 276, a creditor must show intent to defraud on the part of the transferor." *HBE Leasing,* 61 F.3d at 1059 n. 5. Whether "fair consideration" is paid is determined 'upon the facts and circumstances of each particular case.' " *Sullivan v. Messer (In re Corcoran),* 246 B.R. 152, 159 (E.D.N.Y.2000) (quoting *McCombs,* 30 F.3d at 326)).

### The Transfer of the Dix Hills House by Rossi to Mountain Investments

■ Caponigro argues that when Rossi transferred the Dix Hills House to Mountain Investments, Cambridge was profitable, and the transfer was made as part of Rossi's estate planning. Caponigro Mem. at 4. She states:

In or about October, 1999, Tom Rossi consulted with Cambridge's corporate attorney, [Eisenmesser] ... to establish certain family limited partnerships and family trusts with which to preserve Tom Rossi's assets, and for estate planning purposes. At the time of the transactions, Cambridge was both operating profitably, *and had an extraordinarily high net income for a company of its*

*size.* Tom Rossi did not at the time have any creditors relating to his position at Cambridge.... On June 6, 2000, Tom Rossi transferred the [Dix Hills House] to Mountain, a family limited partnership of which Tom Rossi was general partner. This transfer was done as part of an estate plan that was prepared and designed by attorney Eisenmesser.

*Id.*

In support of her argument, Caponigro cites the affidavit testimony of Eisenmesser, as follows:

In or about October 1999, Tom Rossi consulted with me for the purpose of creating an estate plan which would enable him to preserve his wealth and assets for the benefit of certain of his family members. At the time, Mr. Rossi was neither married, nor engaged to be married. From our discussions, it was clear that he did not at the time have any then present intention of marrying, but wished to provide for his godchildren, certain of his nieces and nephews and his grandmother, Louise Lavino.

... I created Mountain, a Delaware Limited Partnership on June 6, 2000. At the time the vehicles were prepared, Cambridge was very profitable and was making a good deal of money for a company of its size. I knew from reviewing a portion of Cambridge's tax return, that it had an extremely positive income stream, as well as a significant net income ....

Tom Rossi's desire to engage in estate planning was both usual and prudent. Although Mr. Rossi was not at the time married and had no other children, he wanted to start preserving his budding wealth, and build an estate which would benefit his nieces and nephews, and if later appropriate, his own children. Although I am not aware of each and

every transaction engaged in by Mountain, I do know that Mr. Rossi transferred title to his home into Mountain on or about the date that Mountain was formed. Without more, such a transaction is very common.

Eisenmesser Aff. ¶¶ 5, 6, 8.

The Trustee disputes that the transfer of the Dix Hills House by Rossi to Mountain Investments was a transfer for estate planning purposes and asserts:

> Rossi also sought to protect his personal assets (namely, his residence) from any potential judgment that might be entered against him.... On June 6, 2000, just three weeks before Cambridge filed its BDW and Rossi transferred almost $1 million from Cambridge's account to the newly formed Chess Match account, and at a time when Rossi was facing claims from third-parties, Rossi transferred legal title to the Dix Hills House from his name into the name of his limited partnership, Mountain Investments.

Trustee's Mem. at 6.

The record shows that on April 7, 1999, Rossi purchased the Dix Hills House from Caledonia Construction Corp. for $711,500. Caponigro Aff., Exh. A (property transfer record). The record also shows that in or about October 1999, Rossi consulted with Eisenmesser, who was Cambridge's corporate attorney, about establishing certain family limited partnerships and trusts. Eisenmesser Aff. ¶ 5. The record further shows that Eisenmesser created Mountain Investments on June 6, 2000, and that Rossi transferred title to the Dix Hills House to Mountain Investments on the same day. Eisenmesser Aff. ¶¶ 6, 8; McCahey Decl., Exh. 16 (deed dated June 6, 2000, from Rossi to Mountain Investments). The record does not indicate that transfer tax was paid when the Dix Hills House was transferred to Mountain In-

vestments. McCahey Decl., Exh. 16 (deed dated June 6, 2000, from Rossi to Mountain Investments and Suffolk County Recording and Endorsement Page). And it shows that less then five weeks before the transfer, Cambridge filed its BDW, Rossi was aware of certain claims against him and Cambridge. McCahey Decl., Exh. 1 (testimony of Rossi) at 23:9–13; 24:18–23; McCahey Decl., Exh. 3 (affidavit sworn to on April 19, 2002, of Danielle Bellanger).

The Trustee cites evidence that appears to conflict with Caponigro's argument that when Rossi formed Mountain Investments and transferred the Dix Hills House to Mountain Investments, Cambridge was "making a good deal of money" and had an "extremely positive income stream, as well as a significant net income." Eisenmesser Aff. ¶ 6. For example, the Trustee cites Rossi's sworn deposition testimony as follows:

Q. Can you tell me briefly, and we will cover this later on, but briefly why Cambridge Capital ceased to do business?

A. It became apparent that some months before July or July 13th, if that's the date, that the overall market climate had changed and the market had started to correct and that had been going on for a while. A lot of the technology and the internet stocks that had been on a significant upward trend for a period of time had seemed to go in the other direction. Cambridge was losing a lot of business. The brokers of Cambridge were starting to lose some of their customers and we attempted to sell the firm or to try to find some buyers for the firm and had some conversations that looked like they were going places that just fizzled out as the market continued to drop. Just fizzled out and it was

just a real business decision that the time had come to move on. We didn't think we would be successful with the same operation going forward in 2000 as we had been in the couple years prior.

. . .

Q. When did this trend, the decline in the market and the impact upon Cambridge Capital's business, when did you first become aware of that?

A. I don't recall. I seem to remember sometime in late '99 that things weren't as rosy as they had been certainly in early 2000. Whatever correction that still exists today was in full swing and underway.

Q. When did you decide to close the business? How soon before you actually closed it was that decision made?

A. There had been discussions about it for a period of time before July. I would say February, as early as February there were hard-core discussions about the future of the firm.

McCahey Decl., Exh. 1 (testimony of Rossi) at 24:25–26:18.

The Trustee also cites Eisenmesser's own deposition testimony, and argues that Eisenmesser based his assessment of Cambridge's performance on limited information. September 16 Arnott Decl. ¶ 6. The Trustee contrasts this with Caponigro's assertion that at the time of Rossi's transfer of his home to Mountain Investments, Cambridge "was both operating profitably, *and had an extraordinarily high net income for a company of its size.*" Caponigro Mem. at 4 (emphasis in original). Eisenmesser testified:

Q. —"Cambridge was very profitable and making a good deal of money for a company its size." And you say that you base that, I suppose,

upon reviewing a portion of Cambridge's tax return; is that correct?

A. Well, it would be because of my understanding of the K–1. I mean for 1999, you know, the return had a tremendous amount of profits.

Q. So your understanding of the profitability of Cambridge was looking at the K–1?

A. And the financial statements.

Q. Did you do any comparison to prior years?

A, I knew the prior years, the prior years were horrendous.

Q. Did you look at any other financial data?

A. No.

Q. Did you discuss Cambridge's finances with Mr. Rossi?

A. Sort of, I mean, I used to compliment him how well he was doing.

Q. I am talking about in the context of this estate planning—

A. No, no I mean—

Q. —sometime between January of 2000 and June 6 of 2000 when these documents were executed did you discuss with Mr. Rossi Cambridge's finances?

A. No, I never asked him is Cambridge going out of business during that time frame. I saw the 1999 data and—

Q. You saw the 1999 financial statements and K–1?

A. Yeah, the K–1 from Cambridge to Frances.

Q. The financial statements from Cambridge?

A. And I complimented him how wonderful he was doing.

Q. I am just trying to get at what you are basing this on?

A. I'm basing it—

Q. On those two documents?

A. —those two documents and also perception of being in the office of seeing many employees and things along those lines.

September 16 Arnott Decl., Exh. 25 (testimony of Eisenmesser) at 117:18–119:18.[7]

The Eisenmesser deposition testimony likewise appears to be at odds with Caponigro's assertion that Rossi's transfer of the Dix Hills House to Mountain Investments was part of a common and usual estate plan:

Q. Did [Rossi] advise you that Cambridge was losing a lot of business in early 2000?

A. No.

Q. Did he advise you that he knew by early 2000 that Cambridge would not survive?

A. No.

Q. Did he advise you that he was planning on terminating Cambridge's retail broker activities at the end of June 2000?

A. At the end of June he called me down to the office to discuss terminating the lease. I go what do you mean you're terminating the lease? That's how I found out.

Q. I am talking about prior to June 6.

A. No, no. I found out about that subsequently when he asked me to try to get his deposit back on his lease.

Q. When did he call you to do that?

A. That was at the end of June. To be honest the pit in my stomach hit me because of this stuff. But no, no, it was the end of June.

Q. Why did that pit hit you in the stomach?

A. Because, you know, even, I mean, I am not going to give an opinion whatever, but I knew there was going to be an issue, that was basically it.

Q. What did you believe the issue was going to be?

A. Because basically I sort of gave him an entity which people do use for an asset protection vehicle and all of a sudden what I had thought was an estate vehicle could be used for—

Q. Protecting your assets against creditors?

A. Exactly. And I had thought that I had, you know, created something for estate planning and all of a sudden it may be done for, you know, it may have turned into something.

September 16 Arnott Decl., Exh. 25 (testimony of Eisenmesser) at 120:4–121:21.

Based on the entire record, the Court concludes that Caponigro has not shown the absence of a genuine issue of material fact as to whether Rossi's transfer of the Dix Hills House to Mountain Investments was made with "fair consideration," that is, "a fair equivalent" and in "good faith" pursuant to DCL Section 272.

*The Transfer of the Dix Hills House by Mountain Investments to Caponigro*

Caponigro argues that she is entitled to summary judgment dismissing the twenty-sixth, twenty-seventh, and twenty-eighth claims for relief because there is no genuine issue of material fact as to whether she paid fair consideration to purchase the Dix Hills House from Mountain Investments. Caponigro Aff. ¶ 6. She states that she purchased the Dix Hills House from Mountain Investments for *"full market*

---

**7.** References to September 16 Arnott Decl., Exh. 25 are to pages of the transcript of Eisenmesser's deposition taken on September 7, 2004, by the Trustee.

*value.*" Caponigro Aff. ¶ 9 (emphasis in original). *See id.* ¶¶ 6, 14, 23. Caponigro further argues that at the time of her purchase of the Dix Hills House "she knew nothing of [Cambridge's] affairs, and beyond her relationship with Tom Rossi, there is absolutely nothing to suggest that she had any reason to believe that she was not engaging in an arm's length transaction with Mountain." Caponigro Aff. ¶ 14. *See* Caponigro Mem. at 17. Thus, she argues, she purchased the Dix Hills House for a "fair equivalent therefor" and "in good faith." Caponigro Mem. at 14–15. *See* N.Y. DEBT. & CRED. LAW § 272.

Caponigro states that she purchased the Dix Hills House for $850,000, and financed the purchase with a $499,000 mortgage, $85,000 from Lavino (in consideration for the right to continue to reside at the Dix Hills House for the balance of her life), and $290,000 from her personal assets. Caponigro Aff. ¶ 8. *See* Caponigro Mem. at 14. She also notes that an appraisal dated June 14, 2001, of the Dix Hills House, assigns a value of $850,000, to the Dix Hills House. Caponigro Aff., Exh. C (appraisal dated June 14, 2001, of Dix Hills House). Caponigro cites to the public property transfer records for Suffolk County, New York, which show that she purchased the Dix Hills House from Mountain Investments for $850,000 on August 31, 2001, the total transfer tax amounted to $3,400, a bargain and sale deed was recorded on December 3, 2001, and a mortgage was given to Alliance Funding in the amount of $499,000 for a thirty-year term. Caponigro Aff., Exh. A (Property Transfer Record).

In further support of her argument that she paid a "fair equivalent" for the Dix Hills House, Caponigro presents a March 21, 2001, agreement between Caponigro and Lavino, in which Caponigro granted Lavino the right to remain in an apartment in the Dix Hills House for the remainder of her life, in exchange for a payment of $85,000. Caponigro Aff., Exh. D (agreement dated March 21, 2001, between Caponigro and Lavino). Caponigro also presents a Chase Manhattan Bank check dated June 25, 2001, in the amount of $85,000, drawn by Caponigro and payable to her attorney, Guy Gabazon, to be deposited into his escrow account in connection with the closing. Solomon Decl. ¶ 3; Exh. E (Chase Manhattan Bank check dated June 25, 2001, payable to Guy Gabazon, as attorney, in the amount of $85,000).

Further, Caponigro presents a copy of a Chase Manhattan Bank check dated September 4, 2001, in the amount of $290,000, payable to Mountain Investments. Solomon Decl., Exh. E (Chase Manhattan Bank check dated September 4, 2001, payable to Mountain Investments, in the amount of $290,000). The record shows that the $290,000 Chase Manhattan Bank check was signed by Rossi and endorsed with the language "not used for purpose intended." September 16 Arnott Decl., Exh. 27 (Chase Manhattan Bank check dated September 4, 2001 payable to Mountain Investments, in the amount of $290,000). The record also shows that a Chase Manhattan Bank branch manager describes the endorsement "not used for purpose intended" as a "bank term [that] was placed on the check by the bank," and that the $290,000 check was "deposited to an entity of which Mr. Rossi benefited." Rossi Aff., Exh. A (letter dated April 27, 2005, to Rossi from Linda S. Murman, Chase Manhattan Bank Branch Manager).

Finally, Caponigro cites to Mountain Investments Chase Account statements showing a deposit of $80,897.56 made to that account on September 13, 2001. Solomon Decl., Exh. F (Mountain Investments Chase Account statements). Caponigro states that the deposit of $80,897.56 repre-

sents "the excess loan proceeds from the mortgage after payment of the first mortgage . . ." Solomon Decl. ¶ 4.

The Trustee argues that there is conflicting evidence in the record as to whether Caponigro paid a fair equivalent and is a good faith purchaser of the Dix Hills House. The Trustee does not dispute "that a 'closing' may have taken place" but argues that Mountain Investments received only $80,897.56 for the Dix Hills House, less than ten percent of the $850,000 market price alleged by Caponigro. January 31 Arnott Affirm. ¶ 3. *See id.* ¶ 4. The Trustee states that the $290,000 allegedly paid by Caponigro to Mountain Investments as part of the purchase price for the Dix Hills House was not deposited into the Mountain Investments Chase Account. January 31 Arnott Affirm. ¶ 5. In support of its argument, the Trustee cites to the Mountain Investments Chase Account bank statements for the period July 2000, through July 2004, which do not show a deposit of $290,000. September 16 Arnott Decl., Exh. 24 (Mountain Investments Chase Account bank statements).

The Trustee also cites to the deposition testimony of Eisenmesser to the effect that the sale proceeds were not deposited into the Mountain Investments Chase Account. Eisenmesser testified as follows:

Q. I guess you testified previously that you were aware that Mountain Investments had a bank account?

A. Yes.

Q. Are you aware whether it was a checking, savings account or what type of account it was?

A. Well, if it was a checking account it didn't have many checks written on it because I believe no statements ever came in with checks. And it didn't have much activity. I'm sure in the sale of the real estate, for example, I never saw the proceeds of the sale of the real estate go into that particular bank account.

Q. You have lost me. The proceeds of what sale?

A. Of the sale of the house.

Q. To?

A. From when Lisa-whatever his wife's name is-purchased the house the proceeds did not go into-I did not see evidence of the proceeds going into the account.

September 16 Arnott Decl., Exh. 25 (testimony of Eisenmesser) at 156:18–157:17.

The Trustee further cites to documents at odds with Caponigro's assertion that she used $290,000 of her personal funds to purchase the Dix Hills House. The Trustee presents a letter dated May 9, 2005, from Doreen Bertone of Chase Manhattan Bank with attachments reflecting that the $290,000 Chase Manhattan Bank check was drawn on an account (the "Best Web Chase Account") under the name of Best Web, Inc. ("Best Web"), a company the Trustee asserts is owned and operated by Rossi's cousin, and not on an account owned by Caponigro. May 19 Arnott Decl., Exh. 29 (letter dated May 19, 2005, from Bertone to Trustee's counsel). The Trustee argues that the attachments to Bertone's letter show that the $290,000 Chase Manhattan Bank check was re-deposited into Best Web's account on the same day it was issued. *Id.* In addition, the Trustee asserts that Best Web's Chase Account bank statements, produced to the Trustee in redacted form, do not show a withdrawal for $290,000 to Mountain Investments. January 31 Arnott Affirm. ¶ 5; Exh. 28 (Best Web Chase Account statements).

Based upon the entire record, the Court concludes that Caponigro has not shown the absence of a genuine issue of material fact as to whether her purchase of the Dix Hills House from Mountain Investments was made for a "fair equivalent therefor" under DCL Section 272.

The Trustee also argues that fact questions exist as to whether Caponigro was "without knowledge of the fraud at the time of the purchase" so that the exception for purchasers for fair consideration without knowledge of the fraud contained in DCL Section 278 does not apply.[8] The Trustee argues that Caponigro purchased the Dix Hills House from "an entity controlled by her future husband, and fund[ed] part of the purchase price with questionable assets." Trustee's Mem. at 20. As noted above, discovery in this matter is not complete, and the deposition of Caponigro has not been taken. *See* p. 57, *supra*. At this stage in the proceedings, the record is incomplete as to whether Caponigro knew or should have known of the financial condition of Cambridge and Rossi, whether she knew or should have known whether Rossi's intent in transferring his home was to hinder, delay or defraud his creditors, or whether she knew or should have known that Best Web provided the funds for the purchase of the Dix Hills House and that those funds were returned to Best Web. Accordingly, the Court finds that there exists a genuine issue of material fact as to whether Caponigro's purchase of the Dix Hills House from Mountain Investments was made in good faith.[9]

In sum, the Court concludes that Caponigro has not established that, "with all conflicts in the evidence resolved and all reasonable inferences drawn in favor of [the Trustee] . . . a reasonable jury could [not] find" for the Trustee on these issues. *See Lippe*, 249 F.Supp.2d at 374. Accordingly, based on the entire record, Caponigro's Motion for Summary Judgment dismissing the twenty-sixth, twenty-seventh, and twenty-eighth claims for relief is denied.

### *Conclusion*

Based upon the entire record, and for the foregoing reasons, the Motion for Summary Judgment is denied. A separate order in conformity with this Memorandum Decision shall be entered simultaneously herewith.

---

**8.** DCL Section 278 allows creditors who have established that a conveyance is fraudulent and are in possession of a mature claim, to seek an order to "set aside" the conveyance "to the extent necessary to satisfy his claim" or to "[d]isregard the conveyance and attach or levy execution upon the property conveyed." Section 278 also provides an exception to the creditor's ability to have a fraudulent conveyance set aside is if the purchaser is a "purchaser for fair consideration without knowledge of the fraud at the time of the purchase." N.Y. DEBT. & CRED. LAW § 278 (McKinney 2001).

**9.** As to the remaining elements of the Trustee's twenty-sixth, twenty-seventh, and twenty-eighth claims for relief, the Court notes that, at this stage in the proceedings, the record does not contain sufficient evidence to support the conclusion that there is no genuine issue of material fact as to a necessary element of the Trustee's claims.